[Cite as *In re Guardianship of T.M.D.-D*, 2021-Ohio-3249.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
WASHINGTON COUNTY

| | | |
|---|---|---|
| In Re: Guardianship of T.M.D.-D. | : | Case No. 20CA36 |
| | : | |
| | : | <u>DECISION AND</u> |
| **RELEASED 9/15/2021** | : | <u>JUDGMENT ENTRY</u> |

_____

<u>APPEARANCES</u>:

Ryan B. Green, The Ryan B. Green Law Firm, LLC, Columbus, Ohio, for appellant.

Timothy C. Loughry, Loughry, Buell & Sipe, LLC, Marietta, Ohio, and Paul Giorgianni, Giorgianni Law LLC, Columbus, Ohio, for appellee.

_____

Hess, J.

**{¶1}** C.D. ("Father") appeals from a judgment of the Washington County Court of Common Pleas, Probate Division, denying his motion to terminate the guardianship of his child, T.M.D.-D. Father maintains that the probate court abused its discretion by relying on facts outside the record, changing the language of its prior orders, finding the guardianship was permanent rather than temporary, and not terminating the temporary guardianship. For the reasons that follow, we reject his contentions and affirm the probate court's judgment.

I. FACTS AND PROCEDURAL HISTORY

**{¶2}** On July 3, 2017, T.M.D.-D., the son of Father and K.D. ("Mother"), was born in Ohio. On March 16, 2018, S.S. ("Aunt"), the child's maternal aunt, filed an application in the probate court to be appointed the child's guardian. The application states that a guardianship is necessary because "the ward's interests will be promoted by the appointment of a guardian. The ward's mother is in a rehabilitation facility and the ward's father is a full[-]time student in CO. The applicant is willing and able to

provide for the ward's basic needs." The application form has places for an applicant to indicate whether the type of guardianship applied for is "non-limited," "limited," "person and estate," "estate only," or "person only." On Aunt's application, the "non-limited" and "person and estate" options are marked. The application form has places for an applicant for a limited guardianship to list the limited powers requested and indicate whether the length of the guardianship requested is "indefinite" or "definite to" a date specified by the applicant. On Aunt's application, the "definite to" option is marked and the date specified is July 3, 2035, i.e., the child's eighteenth birthday. Mother and Father signed waiver of notice and consent forms stating: "We, the undersigned, do each of us hereby waive the issuing and service of notice, and voluntarily enter our appearance herein. We do hereby consent to the appointment of [Aunt]."

{¶3} On April 12, 2018, the probate court issued a judgment finding that a guardianship was necessary and appointing Aunt guardian of the child's person and estate "with the powers conferred as described, and limited to those powers contained in the [l]etters of [g]uardianship issued by this Court." The letters of guardianship gave Aunt power over the child's person and estate and specified that the powers "until revoked" were for an "[i]ndefinite time period."

{¶4} On November 13, 2019, Father moved to terminate the guardianship. The probate court conducted a hearing on the motion at which Father testified that he previously instituted an action in juvenile court seeking full custody of the child. He lives in Colorado, and around the time, was a full-time student enrolled in two bachelor's degree programs, was interning as a deputy probation officer in Larimer County's Eighth Judicial District, and was enrolled in a vocational rehabilitation program. Father testified

that Aunt's attorney, Timothy Loughry, approached him about coming to an agreement in the juvenile court case while he was in school. He agreed to the guardianship and intended that it would last until he graduated and was in a better position to care for the child. Father testified that he was never advised that the guardianship was permanent and would not have agreed to a permanent guardianship. Father introduced into evidence a February 6, 2018 email he sent to his vocational rehabilitation coordinator and copied to Loughry which states:

> Tim Loughry may reach out to you, as he is helping to resolve custody proceedings in Ohio regarding my son. I wanted to give you a heads up, so if he gives you a jingle please know you have my expressed [sic] consent to discuss this matter with him.
>
> If you need a release for him to communicate with you please let me know. The conversation is generally regarding giving my son's aunt the legally [sic] ability to make decisions on my behalf and whether or not the VA would honor that if she were to be named by the court a residential custodial guardian while I'm in the Vocation Rehabilitation and Employment program.

Father testified that at the time, he anticipated being in the referenced program for two years. He also testified that during a March 9, 2018 pretrial conference in the juvenile court case at which Loughry was present, Father told a magistrate that he needed help with his son and that the guardianship "would only be for a couple of years." Father testified that he did not see the guardianship application until about 10 days after the probate court issued the letters of guardianship.

{¶5} Father testified that he is now in a position to care for the child. He completed his bachelor's degrees on "an accelerated basis," earning a Bachelor of Social Work from Colorado State University and a Bachelor of Science from Charter Oak State College in May 2019. He finished the vocational rehabilitation program. He

is pursuing a master's degree online but has classes only three hours a week. He indicated that he might pursue a law degree in the future.  Father testified that he is not employed but has the financial means to provide for the child and expected to become a full-time probation officer upon completion of his internship. Father testified that since the creation of the guardianship, he has visited the child and communicated with him via phone calls and FaceTime. Father had "a list" of objections to the way Aunt cared for the child but would not elaborate on the subject.

{¶6}    Aunt testified that she and Father "never really discussed" the duration of the guardianship at the time it was established, but she intended it to be "indefinite" and last until the child turned 18 or graduated from high school.  According to Aunt, the guardianship was in place for over a year before Father mentioned it being short term or the child moving to Colorado.  Aunt testified that Mother is a drug addict, and the reason for the guardianship was "[t]o take care of [the child] and provide what his Mother could not.  To keep him here in a family environment, to where he would grow up with his siblings in a house.  And his cousins and his grandparents."  Aunt testified that her and Father's main concern was to keep Mother away from the child.  Aunt and Father agreed that Mother should only have supervised visitation with the child and needed to be sober for at least five years and living in her own home "to have any kind of parental rights."  But Aunt and Father knew "it wasn't looking good for that." Aunt testified that she is married and has four children.  Aunt and Father discussed the child living with her because Father "was in school, and he wanted [the child] to stay and grow up in a house with children and siblings and family.  Something that he himself never had." When the guardianship application was filed, Father talked about moving to Ohio "[t]o

be closer to [the child]" and how he was looking at jobs in Cincinnati, Columbus, and Parkersburg. Aunt testified that she and Father discussed her enrolling the child in preschool when he turned three and discussed "long[-]term plans for parenting time" but never "put anything in [sic] paper." Aunt testified that the child is integrated into her family, that she provides for his needs, and that she is willing and able to continue doing so and serving as his guardian.

{¶7} L.D. ("Grandmother"), the child's maternal grandmother, testified that the guardianship was established because of Mother's "addiction problems." Grandmother was unaware of Father specifically asking anyone in her family to take the child until he turned 18. However, Grandmother believed the guardianship would last until the child finished school. Around the time the guardianship was established, Father told Grandmother that he enjoyed her family's dynamics and how "that's what he wanted for his son" "[b]ecause he did not have that as a child growing up." Grandmother explained that family dynamics meant "[t]he brothers, and nieces and nephews, all being there with [the child]." Father never discussed the child moving to Colorado to live with him or said anything that made Grandmother believe the guardianship would end before the child turned 18. Father told Grandmother that after he finished school, he planned to come to Ohio to be closer to her family and the child. Grandmother testified that the child is integrated into her family and calls Aunt "Mom."

{¶8} The probate court denied the motion to terminate and ordered "that the guardianship shall continue in full force and effect until the child's 18th birthday." The court stated that resolution of the case turned on whether the guardianship "was meant to be [t]emporary or [p]ermanent (i.e., until age 18)." If the guardianship was temporary,

the court could remove the guardian for "good cause" under R.C. 2111.46. If the guardianship was permanent, the court had to apply R.C. 3109.04(E)(1)(a) and could only terminate the guardianship if there had been an adverse change in the custodial environment and a change of custody was in the best interest of the child.   The court stated:

> The Court having considered the evidence presented in this matter finds by clear and convincing evidence that both parents relinquished custody through the signing of the consents and that the guardianship * * * was meant to be a permanent guardianship until the child reached age 18. The application clearly stated that it was non-limited and would last until the child's 18th birthday on July 3, 2035.   Although the letters of guardianship issued on April 12, 2018, state that the time period was for an indefinite time period rather than age 18, the Court finds said discrepancy irrelevant for the fact that the Court clerk prepared the [l]etters rather than the attorney and this Court did not catch its mistake.   The Court believed at the time it issued the letters that said guardianship was to last until the child's 18th birthday based on the application and consents filed.
>
> Both the guardian and the child's maternal grandmother also believed based on their conversations with the father that the guardianship would last until age 18.   The only person who thinks otherwise is the father.   However, by his own testimony he stated that he became aware that the end date of the guardianship was listed as age 18 when he got a copy of the application in late April 2018, approximately 7 to 10 days after the entry appointing a guardian and letters of guardianship were filed. Why then, the Court wonders, did he wait until approximately August 2019 to start questioning the guardian about the issue and then wait until November 2019, approximately 1 ½ years after discovering that the guardianship would last until age 18, to file a motion to terminate.   The Court believes the father misses his son, as any parent would, and now regrets his decision to enter into a guardianship.   However, it is clear to the Court now, as it was in April 2018, that the guardianship was meant to be permanent until the child's 18th birthday.
>
> * * * In the present case there is no change in circumstances with respect to the guardian or ward.   Since the guardianship was granted two and a half years ago, the guardian and child are both doing well with the situation.   No evidence was presented that the guardian is not providing for the child.   Nothing has changed with either of them.   It is still in the child's best interest to continue living with the guardian."

**{¶9}** Subsequently, Aunt moved to terminate the guardianship of the estate, asserting it was unnecessary. The court granted the motion and issued revised letters of guardianship indicating Aunt has power over the child's person only and that her powers "until revoked" are for a "[d]efinite time period to July 3, 2035 (Date of Minor's 18th Birthday)." The same day, Father filed a notice of appeal from the entry denying his motion to terminate the guardianship.

## II. ASSIGNMENTS OF ERROR

**{¶10}** Father presents the following assignments of error:

1. The trial court abused its discretion in using facts that were not part of the record and changing the language of its prior orders in order to reach it [sic] preferred outcome.

2. The trial court abused its discretion in finding the guardianship to be permanent.

3. The trial court abused its discretion when it did not terminate the temporary guardianship.

## III. LAW AND ANALYSIS

### A. Standard of Review

**{¶11}** We will not reverse a probate court's ruling on a motion to remove a guardian absent an abuse of discretion. *In re Guardianship of Zornes*, 4th Dist. Lawrence No. 96CA35, 1997 WL 441854, *5 (Aug. 4, 1997). An abuse of discretion is "an unreasonable, arbitrary, or unconscionable use of discretion, or * * * a view or action that no conscientious judge could honestly have taken." *State v. Brady*, 119 Ohio St.3d 375, 2008-Ohio-4493, 894 N.E.2d 671, ¶ 23. In addition, we will not reverse a trial court's factual findings if they are supported by "some competent, credible evidence." *Beaver v. Beaver*, 4th Dist. Pickaway No. 18CA5, 2018-Ohio-4460, ¶ 29. "[W]e are

mindful that the trial court is in the best position to judge credibility of testimony because it is in the best position to observe the witness's gestures and voice inflections." *Id.*

## B. General Principles

{¶12} " 'The right of a parent to the custody of his or her child is one of the oldest fundamental liberty interests recognized by American courts.' " *In re H.R.P.T.*, 4th Dist. Scioto No. 20CA3915, 2021-Ohio-2285, ¶ 33, quoting *In re Thompkins*, 115 Ohio St.3d 409, 2007-Ohio-5238, 875 N.E.2d 582, ¶ 10. "Consequently, '[p]arents have a constitutionally protected due process right to make decisions concerning the care, custody, and control of their children, and the parents' right to custody of their children is paramount to any custodial interest in the children asserted by nonparents.' " *Id.*, quoting *In re Mullen*, 129 Ohio St.3d 417, 2011-Ohio-3361, 953 N.E.2d 302, ¶ 11. " 'The general rule in Ohio regarding original custody awards in disputes between a parent and a nonparent is that "parents who are 'suitable' persons have a 'paramount' right to the custody of their minor children unless they forfeit that right by contract, abandonment, or by becoming totally unable to care for and support those children." ' " *Id.* at ¶ 34, quoting *Masitto v. Masitto*, 22 Ohio St.3d 63, 65, 488 N.E.2d 857 (1986), quoting *In re Perales*, 52 Ohio St.2d 89, 97, 369 N.E.2d 1047 (1977). "Parents who have relinquished custody through waiver, contract or consent are bound by their agreement to do so, and thus lose the preferential status in subsequent custody actions." *Zornes* at *3, citing *Masitto* at 65.

## C. Statutory Standard for Termination of a Guardianship

{¶13} The probate court found that when a parent consents to a guardianship and later seeks to terminate it, the statutory standard for termination depends on

whether the parent relinquished his or her paramount right to custody when consenting to the guardianship. The probate court found that if the parent agreed to a temporary guardianship, R.C. 2111.46 applies, which states: "When a guardian has been appointed for a minor before the minor is over fourteen years of age, the guardian's power shall continue until the ward arrives at the age of majority, unless removed for good cause or unless the ward selects another suitable guardian." The court explained that because the parent retains the right to preferential treatment in a subsequent custody determination, the parent can meet the good cause standard with evidence that he or she "is able and suitable to be a parent." The probate court found that if the parent agreed to a permanent guardianship, R.C. 3109.04(E)(1)(a) applies, which states:

> The court shall not modify a prior decree allocating parental rights and responsibilities for the care of children unless it finds * * * that a change has occurred in the circumstances of the child, the child's residential parent, or either of the parents subject to a shared parenting decree, and that the modification is necessary to serve the best interest of the child.

{¶14} The probate court relied on *Masitto* for the proposition that R.C. 3109.04(E)(1)(a) applies to a motion to terminate a permanent guardianship. *Masitto* upheld a trial court's decision to proceed under former R.C. 3109.04(B), now R.C. 3109.04(E)(1)(a), where a parent requesting a change in custody forfeited his natural rights to custody of his child by consenting to a guardianship and divorce decree that referenced it. *Masitto* at 65-66. We observe that in *Masitto,* the appeal arose from a domestic relations court's ruling on a motion for a change in custody, not a probate court's ruling on a motion to terminate the guardianship. *See id.* at 64-65; *id.* at 68-69 (Celebrezze, C.J., dissenting).

{¶15} We also observe that in *In re Spriggs,* 4th Dist. Scioto No. 89-CA-1803, 1990 WL 54871 (Apr. 24, 1990), we implied that former R.C. 3109.04(B) applied to a motion to terminate a permanent guardianship. *See Spriggs* at *2 ("Based upon the probate court's finding of fact that [the mother] did not contract away her rights to custody, the probate court was not required to apply the stringent test of 'the best interest of the child' under R.C. 3109.04 * * * but rather, simply could have applied the 'good cause' test of R.C. 2111.46 for termination of guardianship"). However, we did not make a holding to that effect because we upheld the probate court's determination that the guardianship in that case was temporary. *Id.* And in a subsequent case involving a permanent guardianship, we stated that the parent had to "meet the requirements of R.C. 2111.46 for termination of the guardianship" and made no mention of R.C. 3109.04. *Zornes*, 4th Dist. Lawrence No. 96CA35, 1997 WL 441854, at *4. We did, however, observe that the phrase "good cause" in R.C. 2111.46 "is broad enough to encompass the child's best interest." *Zornes* at *4, fn. 3, citing *Spriggs*.

{¶16} Because Father does not challenge the probate court's finding that R.C. 2111.46 applies to a motion to terminate a temporary guardianship and R.C. 3109.04(E)(1)(a) applies to a motion to terminate a permanent guardianship, we need not address the issue further.

### D. First Assignment of Error

{¶17} In his first assignment of error, Father contends that the probate court abused its discretion because it used "facts that were not part of the record" and changed "the language of its prior orders." Father asserts that this case is similar to *In re Guardianship of B.I.C.,* 9th Dist. Wayne No. 11CA0028, 2012-Ohio-3519, and that

the guardianship should be presumed temporary because the letters of guardianship

stated that it was indefinite. Father maintains that the probate court made up facts to

find the guardianship was permanent when it stated:

> Despite the fact that the [a]pplication was for a non-limited guardianship, the attorney wanted to make it clear on the form that it was to continue until the child turned 18 and so the date of the child's 18th birthday was written in under the limited guardianship part of the form to show the intent that it would last until age 18, even though it was not a limited guardianship.

Father asserts that "neither Attorney Loughry nor the Court ever testified about the

[a]pplication."

{¶18} Competent and credible evidence supports the probate court's finding of

fact about the application. Aunt signed the guardianship application but testified that

she did not fill it out. Although Attorney Loughry did not testify, it appears that he also

signed the application in his capacity as Aunt's attorney. The probate court could

reasonably infer that he approved the language in the application, regardless of whether

he personally filled it out,[1] because he wanted to make it clear that the guardianship

was to last until the child turned 18. The application specifically requested that duration

for the guardianship even though the form used required only limited guardianship

applicants to state a requested duration, and Aunt sought a non-limited guardianship.

{¶19} Father also claims the probate court changed the letters of guardianship

from granting a temporary guardianship to granting a permanent one when it stated:

> Although the letters of guardianship issued on April 12, 2018, state that the time period was for an indefinite time period rather than age 18, the Court finds said discrepancy irrelevant for the fact that the Court clerk prepared the [l]etters rather than the attorney and this Court did not catch

---

[1] During oral argument, Attorney Loughry indicated that he did not complete the portion of the application requesting that the guardianship last until the child turned 18 and suggested that he did not know who handwrote that information on application. However, those facts are not part of the record on appeal.

its mistake. The Court believed at the time it issued the letters that said guardianship was to last until the child's 18th birthday based on the application and consents filed.

In his reply brief, Father characterizes the court's statement about its belief as an attempt by the judge to "clarify the record for the first and only time in his Judgment Entry years later and thus evade cross-examination, which offends due process, is improper, unethical and changed the outcome of the case."

{¶20} Father's contention that the probate court improperly modified the letters of guardianship is not well taken. Contrary to what Father suggests, the letters of guardianship reasonably could be interpreted to grant Aunt's request for a guardianship until the child turned 18. It is true that the letters of guardianship stated that the guardianship duration was indefinite instead of definite until the child turned 18. However, in this context there is no practical difference between the duration requested and the duration granted because even though the court did not specify an end date for Aunt's powers, they would terminate by operation of law when the child turned 18. *In re Guardianship of Hollins*, 114 Ohio St.3d 434, 2007-Ohio-4555, 872 N.E.2d 1214, syllabus ("When a guardianship is predicated exclusively on a ward's minor status, the guardian's power and the probate court's jurisdiction both terminate when the ward reaches the age of majority").

{¶21} The fact that the letters of guardianship did not denominate the guardianship's term as temporary or permanent entitled Father to a presumption that the guardianship was temporary but only in the absence of clear and convincing evidence to the contrary. *Spriggs*, 4th Dist. Scioto No. 89-CA-1803, 1990 WL 54871, at *2. Here, the probate court found by clear and convincing evidence that the

guardianship was permanent. As we will explain in the next section, that finding is supported by some competent, credible evidence, and Father's reliance on *B.I.C.* is misplaced.

**{¶22}** For the foregoing reasons, we overrule the first assignment of error.

### E. Second Assignment of Error

**{¶23}** In his second assignment of error, Father contends that the probate court abused its discretion when it found the guardianship was permanent. Father maintains that the record clearly establishes that the guardianship was temporary. Father directs our attention to an uncertified copy of an April 12, 2018 agreed entry from the juvenile court proceeding which he attached to his appellate brief. He asserts that the entry designated him "sole residential and legal custodian" and that while it indicates the parties agreed to a guardianship, "[t]here was no mention that the [g]uardianship was permanent." He claims Attorney Loughry proposed a temporary guardianship, and Father agreed because he was busy with college, an internship, and a vocational rehabilitation program. Father also claims Attorney Loughry knew Father believed the guardianship was temporary based on statements he made in the February 6, 2018 email and at the March 9, 2018 pretrial conference. Father maintains that there is evidence he intended the guardianship to be temporary and that Attorney Loughry and Aunt never told him they intended it to be permanent. He suggests Aunt actually intended for the guardianship to be temporary because she testified that she intended it to be "indefinite" and contemplated Mother regaining parental rights. He claims Aunt and Grandmother provided no basis for their belief that the guardianship would last until the child turned 18 or finished school. He maintains that the guardianship application's

stated reasons for the guardianship "do not indicate permanency as schooling and even rehabilitation are temporary in nature." Father also claims that he did not see the application until after the court issued the letters of guardianship. He suggests it was logical for him to finish college and the vocational rehabilitation program before moving to terminate the guardianship because that was the parties' agreement, and the letters of guardianship "confirmed" his understanding that the guardianship was temporary.

**{¶24}** Father asserts that "[t]he instant matter is closely aligned with other cases in which the [g]uardianship was found to be temporary," citing *In re Guardianship of Godsey*, 2d Dist. Clark No. 2002-CA-69, 2003-Ohio-2692; *In re Guardianship of Smith*, 12th Dist. Preble No. CA2002-12-012, 2003-Ohio-4247; and *B.I.C.* He suggests this case is distinguishable from cases in which courts have found guardianships to be permanent because in those cases, "the definition of a permanent guardianship and the consequences thereof (a loss of parental rights) were expressly discussed with the party consenting to the [g]uardianship." He directs our attention to *In re Guardianship of Dillon*, 5th Dist. Holmes No. 05CA008, 2005-Ohio-5217, and *In re Guardianship of Sanders*, 118 Ohio App.3d 606, 693 N.E.2d 1101 (2d Dist.1997).

**{¶25}** "Given a parent's paramount right to custody under Ohio law, absent clear and convincing evidence to the contrary, a guardianship that does not denominate its term as being either temporary or permanent, should be presumed to be temporary in nature." *Spriggs*, 4th Dist. Scioto No. 89-CA-1803, 1990 WL 54871, at *2. "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the

trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. "[W]hether a parent permanently relinquishes rights to custody by consent to a guardianship, *i.e.,* whether the guardianship was intended to be temporary or permanent, ultimately is a factual question and will not be disturbed if supported by some competent, credible evidence." *Zornes*, 4th Dist. Lawrence No. 96CA35, 1997 WL 441854, at *4.

**{¶26}** Here, the letters of guardianship did not denominate the term of the guardianship as temporary or permanent; however, some competent, credible evidence supports the probate court's finding by clear and convincing evidence that it was meant to be permanent. It is not obvious that the child needed a permanent guardianship from the reasons for the guardianship listed on Aunt's application. However, the application specifically requested that the guardianship last until the child's eighteenth birthday, and the parents signed forms giving their unqualified consent to the guardianship.

**{¶27}** Aunt gave testimony which supports the conclusion that the guardianship was permanent. Aunt testified that she intended the guardianship to last until the child turned 18 or graduated from high school. Although Aunt contemplated the possibility of Mother having unspecified parental rights in the future if she met certain criteria, Aunt testified that was unlikely to occur, and there is no evidence the parties agreed to terminate the guardianship if it did. Aunt acknowledged she and Father did not explicitly discuss the duration of the guardianship when it was established. However, she testified about conduct of Father which indicates that he intended the guardianship to be permanent. Father expressed that he wanted the child to live with Aunt so that unlike

Father, the child would grow up in a house with children and family. Father talked about long-term plans for parenting time, moving to Ohio to be closer to the child, and job hunting in and near Ohio. Aunt testified that the guardianship was in place for over a year before Father ever discussed it being short term or the child moving to Colorado.

{¶28} Grandmother also gave testimony which supports the conclusion that the guardianship was permanent. She believed the guardianship would last until the child finished school and testified about conduct of Father which supports that belief. Father commented about how he enjoyed the dynamics in Grandmother's family and how "that's what he wanted for his son." Father did not discuss the child moving to Colorado or otherwise suggest the guardianship would end before the child turned 18. To the contrary, he discussed moving to Ohio after he finished school to be closer to the child.

{¶29} The February 6, 2018 email does not compel a conclusion that the guardianship was temporary. The email contains language about Aunt being "named by the court a residential custodial guardian while [Father is] in the Vocation Rehabilitation and Employment program." Although the email discusses the appointment occurring while Father is in the program, it is not clear from the language used whether the appointment would terminate upon his completion of the program.

{¶30} The probate court, which was in the best position to evaluate the credibility of testimony, did not believe Father's testimony about the guardianship being temporary. The court questioned why, after receiving the guardianship application in late April 2018 and seeing the guardianship end date listed, Father waited "until approximately August 2019 to start questioning the guardian about the issue" and waited "until November 2019, approximately 1 ½ years after discovering that the

guardianship would last until age 18, to file a motion to terminate." The court believed Father "misses his son, as any parent would, and now regrets his decision to enter into a guardianship."

{¶31} The probate court was free to believe Aunt and Grandmother's testimony about the guardianship being permanent and not believe Father's testimony to the contrary. It was reasonable for the court to expect Father to take some action with respect to the guardianship sooner than he did if he intended it to be temporary. The guardianship application plainly requested that the guardianship last until the child turned 18. Even though the letters of guardianship did not state that the guardianship was permanent or would last until the child turned 18, the document gave no indication that the parties had agreed to terminate the guardianship once Father completed college and was in a better position to care for the child. Under these circumstances, one would expect Father to, at the very least, contact Aunt upon receipt of the application to question why it contradicted their agreement and none of the court documents mentioned that agreement.

{¶32} Father's reliance on the agreed entry from the juvenile court proceeding which he attached to his appellate brief is misplaced. The probate court was presumably aware of this entry because it is signed by the same judge who presided over the probate court proceedings. However, Father did not introduce this entry into evidence during the hearing on the motion to terminate, and the probate court's entry on the motion to terminate makes no mention of it. "A reviewing court should consider only the evidence that the trial court had before it." *Saunders v. Holzer Hosp. Found.*, 176 Ohio App.3d 275, 2008-Ohio-1032, 891 N.E.2d 1202, ¶ 8, fn. 2.

**{¶33}** Even if we could consider the entry, it is not dispositive of whether the guardianship was permanent or temporary. The entry states that Mother, Father, and Aunt agreed it was "in the best interest of the child that [Father] be named residential parent and legal custodian of [the child]." However, they also agreed Aunt would apply to be the child's guardian and that the parents would consent to her appointment. The entry does not state that the guardianship is permanent or temporary. The entry acknowledges the guardianship could terminate, stating: "*Should the guardianship* of the person of the minor child *be terminated* for any reason, the parties agree to mediate the issue of residential parent and legal custodian of the minor child. Should mediation be unsuccessful, the parties agree that no change in circumstances must be alleged or proven and that the only issue to be heard and decided by this Court will be what is in the best interest of the child." (Emphasis added.) But this language does not suggest termination was inevitable or expected to occur once Father completed college and was better positioned to care for the child. Notably, there are reasons a guardianship might terminate before a child turns 18 even though the parents intended to permanently relinquish custody to the guardian, such as death or disability of the guardian.

**{¶34}** *Godsey* and *B.I.C.* are inapposite. In *Godsey*, the Second District Court of Appeals affirmed a judgment terminating a guardianship. *Godsey*, 2d Dist. Clark No. 2002-CA-69, 2003-Ohio-2692, ¶ 1, 19. In doing so, the appellate court held that the probate court did not err when it found that the guardianship was temporary. *Id.* at ¶ 10. The appellate court noted the probate court's observations that (1) the guardians "did not request a guardianship for a 'definite' duration, such as until [the child's] eighteenth birthday"; (2) the "letters of guardianship, which described the guardianship as being for

an 'indefinite time period,' reasonably could be interpreted as granting a temporary guardianship"; and (3) a finding that the guardianship was temporary was consistent with the mother's testimony and the fact that the child's "need for medical insurance was the expressed reason for the * * * guardianship application." *Id.* at ¶ 12.

**{¶35}** In *B.I.C.*, the Ninth District Court of Appeals also affirmed a judgment terminating a guardianship. *B.I.C.*, 9th Dist. Wayne No. 11CA0028, 2012-Ohio-3519, at ¶ 17. The father did not consent or object to the guardianship application, and the appellate court held that the probate court did not err when it found the resulting guardianship was temporary. *Id.* at ¶ 2, 10. The appellate court explained that the guardians did not assert that the guardianship was permanent until the father moved to terminate it. *Id.* at ¶ 10. At the time they applied to be guardians, their attorney sent the father a letter stating that they sought " 'to be named as temporary guardians.' " *Id.* at ¶ 2, 10. One of the guardians testified that she understood "temporary" to mean until the child was 18, but "the probate court was entitled not to believe her, considering that her application did not ask for the guardianship to last until that time." *Id.* at ¶ 10. The appellate court noted that the letters of guardianship did not indicate the guardianship would last until the child turned 18 but instead stated that the "the guardianship will be for an '[i]ndefinite' length." *Id.*

**{¶36}** This case is distinguishable from *Godsey* and *B.I.C.* The letters of guardianship in all three cases stated that the guardianship was for an indefinite period of time. However, in this case, the guardianship application explicitly requested that the guardianship last until the child turned 18. As we previously explained, the letters of guardianship reasonably could be interpreted to grant that request. In addition, in this

case, there is some competent, credible evidence that the parties intended the guardianship to be permanent, and the probate court did not believe Father's testimony to the contrary.

{¶37} *Smith* is also inapposite.  In that case, the Twelfth District Court of Appeals affirmed a probate court's judgment terminating a guardianship.  *Smith*, 12th Dist. Preble No. CA2002-12-012, 2003-Ohio-4247, at ¶ 1.  In doing so, the appellate court held that reliable, credible evidence supported the probate court's finding that the guardianship was temporary.  *Id.* at ¶ 12.  The appellate court noted that the mother testified that she never intended to give up permanent custody, that documents she signed regarding the guardianship did not refer to the placement as permanent, and that one document provided "for termination with mutual consent of the parties."  *Id.* at ¶ 13. The appellate court observed that the guardianship application did "not indicate it is permanent" and that the guardians' attorney sent the application to the mother with a letter stating that she had the " 'right to file an application with the court to assert the guardianship is no longer necessary.' "  *Id.*  There was evidence that when the mother agreed to the guardianship, "she was unable to care for herself or her children physically, emotionally or financially."  *Id.* at ¶ 14.  There was also evidence she had been told "she needed to take care of herself and get her life together before she would be able to take care of the children," and the mother testified that she granted the guardianship for that reason.  *Id.*

{¶38} This case is distinguishable from *Smith*.  Here, unlike in *Smith*, the guardianship application requested that the guardianship last until the child turned 18, and as detailed above, there is additional evidence which supports the conclusion that

the guardianship was permanent. Moreover, it is evident that the probate court in *Smith* found the mother's testimony that she never intended to give up permanent custody of her children credible, but in this case, the probate court did not find credible Father's testimony about the guardianship being temporary.

{¶39} Father's reliance on *Dillon* and *Sanders* is misplaced. In *Dillon*, the appellate court held the probate court properly found a guardianship was permanent because "[t]he clear language of the guardianship application" showed the child's grandparents sought a guardianship until the child turned 18, and the entry granting the application "unequivocally" established that the probate court "fully explained the affect [sic] of the guardianship to mother" at the hearing on the application. *Dillon*, 5th Dist. Holmes No. 05CA008, 2005-Ohio-5217, at ¶ 26. In *Sanders*, the appellate court upheld a finding that a guardianship was permanent, noting that the guardian testified that she believed the guardianship was permanent and that the probate judge took judicial notice of the fact that at the guardianship application hearing, he told the mother and guardian that the guardianship was permanent and would be in effect until the child turned 18. *Sanders*, 118 Ohio App.3d at 613-614, 693 N.E.2d 1101.

{¶40} In this case, it is not apparent that Father attended the guardianship application hearing, and there is no evidence the probate court gave him information similar to the information the probate courts gave the parents in *Dillon* and *Sanders*. Such evidence would undoubtedly be helpful in resolving whether the parties intended the guardianship to be permanent or temporary. Nonetheless, as we previously explained, some competent, credible evidence supports the probate court's finding by

clear and convincing evidence that the guardianship in this case was meant to be permanent.  Accordingly, we overrule the second assignment of error.

## F.  Third Assignment of Error

**{¶41}** In his third assignment of error, Father contends that the probate court abused its discretion when it did not terminate the "temporary" guardianship.  Father asserts that by consenting to a temporary guardianship, he did not relinquish his right to "preferential treatment in a subsequent determination of custody" and is entitled to custody of the child so long as he is able and suitable to be a parent.  Father maintains that there is good cause to terminate the guardianship because he is able and suitable to be parent, and the original reasons for the guardianship no longer exist.

**{¶42}** Father's argument is predicated on the assumption that we will sustain his second assignment of error and conclude the guardianship was temporary.  However, we overruled Father's second assignment of error.  Consequently, we overrule the third assignment of error.

## IV.  CONCLUSION

**{¶43}** Having overruled the assignments of error, we affirm the probate court's judgment.

JUDGMENT AFFIRMED.

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT IS AFFIRMED and that appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Washington County Common Pleas Court, Probate Division, to carry this judgment into execution.

Any stay previously granted by this Court is hereby terminated as of the date of this entry.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, J. & Wilkin, J.:  Concur in Judgment and Opinion.


For the Court



BY:  _____
        Michael D. Hess, Judge




**NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**